[Crim. No. 3467.   Second Dist., Div. Two.   Sept. 29, 1941.]

THE PEOPLE, Respondent, v. JACK PRESTON BAYLOR, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Earl Warren, Attorney General, R. S. McLaughlin, Deputy Attorney General, John Dockweiler, District Attorney, and Charles Hollopeter, Deputy District Attorney, for Respondent.

WOOD, J.—Defendant was accused by information of the crime of murder. A jury returned a verdict finding him guilty of manslaughter and he has appealed from the judgment of conviction and from the order denying his motion for a new trial.

At about one o'clock in the morning of December 21, 1940, Howard Perks, who had been working on the afternoon shift at an airplane factory, entered Curley's Café on South Western Avenue near 149th Street in the city of Los Angeles, where defendant was employed as a member of the orchestra. At the café Perks became acquainted with Ann Lorraine, a waitress employed in a Long Beach café, who had been living with defendant in a cottage in Long Beach. Shortly after 2 a. m. defendant, Perks and Miss Lorraine left the café. Defendant and Miss Lorraine entered Miss Lorraine's automobile and drove south on Western Avenue. They had gone but a short distance when Perks drove alongside in his own car and called to them to stop. He invited them to have

a drink and they accepted. They then proceeded down the street for about a mile and a half, when Perks again stopped them and suggested that they all go in one car to a place where they could finish a bottle of liquor which was in his possession. They all entered Perks' car, leaving Miss Lorraine's car parked in the street, and defendant thereafter drove Perks' car. They stopped at an auto camp but for some reason were unable to rent a cabin, and proceeded on to the house in Long Beach where defendant and Miss Lorraine lived, arriving there at about 3:15 a. m.

At the Long Beach house they had several drinks, finishing the bottle, and Perks and Miss Lorraine became intoxicated. Miss Lorraine asked for coffee and defendant went into the kitchen to make coffee. Miss Lorraine testified that Perks threw her backward on the bed and bit her several times on the leg and ''on the left side on the privates.'' Defendant returned from the kitchen and ''grabbed Mr. Perks by the front of the shirt.'' Miss Lorraine testified: ''When Mr. Perks was in the reclining position on the bed, and Mr. Baylor grabbed him by the front of the shirt, Mr. Perks reached up and grabbed the zipper on the front of his trousers and tried to open his trousers. Q. And then what happened? A. Then Mr. Baylor asked him if he was crazy. Q. What did he say? A. I do not know what Mr. Perks said, if anything. Q. Now, what did Mr. Baylor do then, if anything? A. Mr. Baylor slapped him.'' Perks fell from the bed and received a laceration on his eye, causing blood to flow. Perks apologized for his conduct, which he attributed to his drinking, and Miss Lorraine bathed his face. They all thereupon left the house and drove back to the place on Western Avenue where Miss Lorraine's car had been left and stopped about two car lengths back of the Lorraine car.

Defendant and Miss Lorraine entered the Lorraine car and were in the act of starting the motor when Perks drove his car past the Lorraine car, bringing it to a stop a few feet ahead of and to the left of the Lorraine car. He then put his car into reverse and with considerable force backed it into the Lorraine car smashing the left front fender and crushing the radiator grill. When Perks moved his car forward defendant drove the Lorraine car away from the curb and Perks made an ineffectual attempt to again ram the car. Defendant drove rapidly south on Western Avenue but Perks

overtook him and crashed into the rear of the Lorraine car with such violence that the bumpers of the two cars became locked together. Almost immediately after the two cars became locked Perks appeared on the driver's side of the Lorraine car, his arm upraised in a striking position and holding a bright object in his hand. Miss Lorraine called to defendant to watch out and defendant "ducked his head and opened the door on his side of the car and jumped out." The two men then began fighting. Defendant testified that Perks "swung" at him before he left the car, that he thereupon immediately got out of the car and he and Perks "started to fight in the street." He testified: "Well, all of a sudden I connected with a blow to his face or chin, and he had stepped off to the side of the road, on the east side, and there seemed to be a little ditch there, and as he stepped in there, he started to fall towards the east, off the highway. Q. And what did you do when he started to fall? A. Immediately I ducked back to my car, back to Ann's car."

Defendant testified that he then drove away and did not return to the scene of the fight. Miss Lorraine testified that after the car was driven south for awhile she felt the motion of the car turning around and that presently she heard defendant scream, and say, "Christ, I have run over something, I think it is a man or that man." She further testified that she felt "like he had run over a bump"; that defendant kept on driving and went to their home in Long Beach.

Esteban Estrada testified that at about ten minutes before six in the morning of December 21 he saw a body lying in the street, that "the biggest part of that object was west of the white line." He saw a car coming from the south at the rate of about twenty miles per hour and as it approached the body the car turned toward the white line, passed over the body a little to the left of the white line, then turned to the east and proceeded in a northerly direction. Soon after two other approaching cars "turned out" and missed striking the body but a third car ran over the body. This was the body of Perks.

Investigating officers found near Perks' body the head of a flashlight, which was identified as one which Perks carried in the glove compartment of his car. An expert testified that a slight smudge found on the flashlight head was blood.

Dr. Frank Webb, the autopsy surgeon, testified that the immediate cause of the death of Perks was a "comminuted fracture of his skull and subdural hemorrhage"; that the subdural hemorrhage was a hemorrhage between the brain and the dura of the brain; that a comminuted fracture requires the application of force and that from the extent of the fracture the witness would infer that considerable force was applied. The witness further testified: "I would judge that it was due to a blow on the head in that region by something that made a definite laceration of a semicircular type rather than a spread out and extensive laceration. . . . Any object with an oval or curved surface could have created that lesion." He further testified that such an injury would cause immediate unconsciousness and death within five or ten minutes. Dr. Webb also testified that he found a laceration in the region of one of Perks' eyes.

■ The principal contention now made by defendant is that the trial court erred in admitting the testimony of Neal Busch concerning certain occurrences which took place about 24 hours before defendant met Perks. This witness was called after the close of defendant's evidence. He testified, over the objection of defendant, that early in the morning of December 20 he left Curley's Café with defendant, Miss Lorraine and a friend of the witness and the party went to his (Busch's) apartment. The friend, whose name was unknown to Busch, left shortly after the group reached the apartment. Busch testified that he then had an act of sexual intercourse with Miss Lorraine in the presence of defendant; that immediately thereafter defendant had an act of sexual intercourse with Miss Lorraine; and that defendant and Miss Lorraine then indulged in an unnatural sex act. No connection was shown between these acts and the events of the following day. There was no evidence that Busch and Perks were acquainted with each other or that any of the matters related by Busch were known to Perks. A motion to strike out the testimony of Busch was denied. Miss Lorraine and defendant both denied the statements made by Busch.

The trial court committed prejudicial error in admitting the testimony of the witness Busch. ■ It is a rule universally recognized that a defendant in a criminal action cannot be tried for any offense other than that set forth in the information. Other acts of criminality or immorality

cannot be dragged into the case for the purpose of arousing an atmosphere of prejudice against the defendant or to create a probability of his guilt of the charge of which he is on trial. ▇ There are certain exceptions to this general rule, among which might be mentioned instances in which it is necessary to admit evidence of other offenses for the purpose of proving intent, motive, system or malice. (*People* v. *James,* 40 Cal. App. (2d) 740 [105 Pac. (2d) 947].)

▇ In the case under review there is no evidence to bring it within any of the recognized exceptions to the general rule. There was no connection between the occurrences related by the witness Busch and the occurrences relied upon by the prosecution to establish the crime of murder or manslaughter of Perks, nor is there anything in the testimony of Busch from which the guilt of defendant of the charge on which he was being tried could be logically inferred. It is only necessary to make a mere statement of the degrading testimony of Busch to convince that it was highly prejudicial and tended to inflame the minds of the jurors against defendant. He was on trial for murder, and not for immoral conduct, and was entitled to be tried on evidence properly admissible to establish the crime with which he was charged. In *People* v. *Wright,* 144 Cal. 161 [77 Pac. 877], the defendant was accused of murder and was convicted of manslaughter. Although the defendant claimed that the killing was in self-defense, the prosecution was allowed to present evidence of sex relations between the defendant and the former wife of the deceased. The reviewing court reversed the conviction, holding that "this mass of testimony admitted against the defendant was meaningless as to motive, and could have but inflamed, as doubtless it was expected it would inflame, the minds of the jurors against the defendant."

▇ Respondent seeks to justify the admission of the testimony of Busch on the ground that defendant was the first to elicit testimony concerning the sex acts which occurred in the Long Beach house. Respondent points to the fact that in the direct examination of the witness Lorraine the deputy district attorney purposely refrained from asking the witness any questions which tended to bring out the abnormal sex actions of Perks and he now claims that since

defendant's counsel brought out such matters on cross examination of the witness he thereby "opened the door" for the testimony of Busch in rebuttal. We cannot agree with this contention. Defendant was on trial on the charge of murder, a charge in which the prosecution must necessarily prove malice. Perks had been killed and defendant was attempting to justify his conduct in the eyes of the jury. He naturally expected the jury to accept his version of the occurrences which took place immediately preceding the death of Perks and he could not expect the jury to accept his version of the affair unless he frankly brought out all the surrounding circumstances. The prosecution had established by the direct examination of Miss Lorraine that Perks' eye was injured in defendant's residence and Miss Lorraine's testimony on this point was supported by the findings of the autopsy surgeon. Respondent would have defendant refrain from bringing out on cross examination that the injury to the eye resulted from Perks' misconduct. Since the prosecution failed to show all the material facts, it was necessary for defendant to present to the jury the circumstances surrounding the receipt of this injury by Perks. In doing so he brought out the fact that Perks himself had made an assault upon defendant's female companion and had made an unnatural gesture towards defendant. The fact that he presented all of these details to the jury in an endeavor to explain the injury to Perks' eye, which had been established by the prosecution, did not open the door for the prosecution to debase his character in an effort to show disconnected acts of improper sex conduct by defendant on a previous occasion. It is far more reasonable to conclude that the prosecutor, by failing to bring out very material facts concerning the important occurrences in the Long Beach cottage, attempted to entrap the defense into a position which would form the basis for the offer of improper testimony. The trial court erroneously permitted the prosecutor to follow this course and in so doing deprived defendant of a fair trial. A judgment resulting from such procedure must not be allowed to stand.

Section 4½ of article VI of the Constitution of California is not applicable to the present situation. According to the testimony of defendant and of the principal witness for the prosecution, Perks made a felonious assault upon them,

thereby endangering their lives. It could be reasonably concluded that defendant seized the flashlight head from Perks and killed him in self-defense; and that if defendant drove over the body of Perks, which defendant denies, Perks was at that time dead.

The judgment and the order denying a new trial are reversed and a new trial is ordered.

Moore, P. J., and McComb, J., concurred.