137 Cal.App.2d Supp. 859 (1955)
THE PEOPLE, Respondent,
v.
PLYWOOD MANUFACTURERS OF CALIFORNIA, etc., Appellant.
California Court of Appeals. 
Nov. 21, 1955.
 Maurice J. Hindin for Appellant in Crim. A. 3284.
 McCutchen, Black, Harnagel & Greene for Appellant in Crim. A. 3286.
 L. A. Gibbons, Douglas Gregg, A. Andrew Hauk and Macdonald & Halsted for Appellant in Crim A. 3303-3306.
 Bruce Renwick, C. Robert Simpson, Jr., and John M. Hall for Appellants in Crim. A. 3327.
 S. Ernest Roll, District Attorney, Jere J. Sullivan, Robert Wheeler, Fred N. Whichells and Lewis Watnick, Deputy District Attorneys, for Respondent in Crim. A. 3284, 3286 and 3327.
 Roger Arnebergh, City Attorney, Donald M. Redwine, Assistant City Attorney, and Philip E. Grey, Deputy City Attorney, for Respondent in Crim. A. 3303-3306.
 Edmund G. Brown, Attorney General, as Amicus Curiae on behalf of Respondent.
 BISHOP, Acting P. J.
 Each of these cases involves one or more charges, and convictions, of "smog" violation. We have concluded, without any misgivings, that the legislation upon which the several complaints are based is, on its face, constitutional and enforceable. Because we anticipate that the one of the above cases which we find it necessary to reverse may be retried, and because further prosecutions of a like nature will doubtless be undertaken, we are deeming it advisable to express some of our conclusions more fully than we otherwise would do. Even so, we are not undertaking [137 Cal.App.2d Supp. 864] to comment on every contention made by each appellant. Our silence on a proposition is not a good basis for an inference that we have overlooked it.
 As a part of the public campaign against "smog," the Legislature added to the Health and Safety Code, sections 24198-24341, constituting chapter 2 of the 20th division. Section 24208 declares: "As used in this chapter, 'air contaminant' includes smoke, charred paper, dust, soot, grime, carbon, noxious acids, fumes, gases, odors, or particulate matter, or any combination thereof." Section 24242 provides: "A person shall not discharge into the atmosphere from any single source of emission whatsoever any air contaminant for a period or periods aggregating more than three minutes in any one hour which is: (a) As dark or darker in shade as that designated as No. 2 on the Ringelmann Chart, as published by the United States Bureau of Mines, or (b) Of such opacity as to obscure an observer's view to a degree equal to or greater than does smoke described in subsection (a) of this section." For the purposes of contrast only, we note the provisions of section 24243: "A person shall not discharge from any source whatsoever such quantities of air contaminants or other material which cause injury, detriment, nuisance or annoyance to any considerable number of persons or to the public or which endanger the comfort, repose, health or safety of any such persons or the public or which cause or have a natural tendency to cause injury or damage to business or property." Each charge found in the cases we are considering was based on section 24242, so that the meaning and constitutionality of section 24243 are not presently at issue. As no question has arisen about the requirements that the contaminant must come from one source of emission, and continue for three minutes in an hour, we shall, usually, treat them as implicit in any situation, without express reference to them.
 [1] The first question to engage our attention arises out of the contention that the terms employed in the provisions of section 24242 render the section unconstitutionally indefinite. We find this not to be so. [2] A statute is to be interpreted, if it can be done without violence to its language, so as to avoid rendering it unconstitutional. (Palermo v. Stockton Theaters, Inc. (1948), 32 Cal.2d 53, 60 [195 P.2d 1, 5].) [3] Another rule of construction is that a statute shall be read in the light of the problem that it was designed to solve. (Wotton v. Bush (1953), 41 Cal.2d 460, 467 [261 P.2d 256, 260].) [137 Cal.App.2d Supp. 865]
 [4] Without laboring the point, we have concluded that the adjective "noxious," as used in section 24208, must be understood as applying to fumes, gases and odors, as well as to "acids," the word that immediately follows it. It will be noted that "noxious" does not apply to "smoke" and other substances that appear in the section before it does.
 It is not every contaminant that section 24242 prohibits. To run afoul of the statute the contaminant must have one or both of these characteristics: (a) it must be as dark or darker in shade than shade No. 2 on the Ringelmann Chart, or (b) it must have an opacity that obscures "an observer's view to a degree equal to or greater than does smoke described in subsection (a)." [5] With respect to subdivision (a), we have heretofore held, in People v. International Steel Corp. (1951), 102 Cal.App.2d Supp. 935 [226 P.2d 587], respecting a charge of discharging smoke, that the standard made use of in subsection (a) is sufficiently definte to satisfy due process. We see no reason to depart from this conclusion. In proving a violation, a witness may testify although he did not have a Ringelmann Chart actually in the field with him at the time he made his observations. One does not have to have a color chart in his hands to recognize a red flower, a blue sky, or a black bird. The question is one of credibility, not competency. Nor do we see any difficulty arising from the fact that a plume of smoke, for example, may appear less dark than Ringelmann No. 2 from one position, but darker than Ringelmann No. 2 from another viewpoint. If the contaminant has the substance that, fairly viewed from any position, gives it a shade as dark or darker than Ringelmann No. 2, it is condemned, no matter how light in color it may look to someone situated at another vantage point.
 Subdivision (a) only begins to solve the problem of the discharge of contaminants into the air; it does not touch smoke and other substances too light in shade to come up to Ringelmann No. 2. They may be so substantial in nature, however, that they make it impossible to see an object on the other side. We have all seen very white smoke that shut out the view completely. Again, they may obscure the view to a lesser degree than totality. [6] We interpret "opacity" as used in subdivision (b) as meaning "want of transparency." It is so defined in the Century Dictionary and in Webster's New International Dictionary, 2d edition. A substance is transparent, on the other hand, if it has "the [137 Cal.App.2d Supp. 866] property of transmitting rays of light, so that bodies can be seen through--opposed to opaque," to quote from Webster's. [7] We may, therefore, express the test of subdivision (b) in simple terms; it condemns smoke or any other contaminant that is at least as hard to see through as is smoke which is as dark or darker than Ringelmann No. 2. There is nothing mystic or incomprehensible about such a statement.
 [8] There is no unconstitutional uncertainty introduced by the reference to the "observer." Subsection (a) makes no mention of an observer, but, we inquire, how is the comparison of any smoke with the Ringelmann Chart to be made? Obviously by a person who is looking at the chart, or has looked at it until he knows its gradations, and compares the shade of the smoke before him with that of the chart. The extent to which smoke or any other contaminant obscures the view, which is but another way of saying the extent to which it is opaque, may be determined by observation. To have observation, you must have an observer. Surely one who is arguing that a statute should give the common man a standard by which he can judge whether he is violating the law will not insist upon a test that only a scientist with expensive equipment can make.
 [9] The further contention is made that section 24242 is unconstitutional because the ordinary person, having no special training, will not be able to tell whether his smoke is as dark as Ringelmann No. 2, or whether its opacity equals that of smoke that matches Ringelmann No. 2. A moment's reflection detects the flaws in such an argument. [10] A statute is invalid if its terms leave that which it attempts to control shrouded in uncertainty, but a statute which declares an act, identified with certainty, to be unlawful is not rendered unconstitutional because the act, as a fact, may not be readily identifiable by the common man as that forbidden by the statute. One illustration will suffice. Section 20703 of the Health and Safety Code states with definiteness what are "poisons," including, among other things, arsenic compounds. Section 20751 of the same code declares it to be unlawful "for any person to vend, sell or give away ... any poisons ..." unless a poison label is used. The ordinary person does not have the learning to enable him to tell an arsenic compound from a harmless drug. Obviously the prevailing ignorance as to poisons and drugs does not render section 20751 unconstitutional.
 The Ringelmann Chart has, in addition to the varying lines described in People v. International Steel Corp., supra, the [137 Cal.App.2d Supp. 867] notation below chart No. 2: "Equivalent to 40 per cent black," and similarly before chart No. 3: "equivalent to 60 per cent black." Section 24242 does not describe the contaminant it prohibits in subdivision (b) as a 40 per cent or 60 per cent opacity, nor in any manner that justifies a reference to the "equivalents." That which is prohibited is the discharge of a contaminant that has an opacity as great or greater than that possessed by smoke which is as dark or darker in shade than Ringelmann No. 2. "40 per cent black" is nowhere declared to mean 40 per cent opaque.
 Now we come to what we consider the most difficult question before us. Obviously the Legislature, in drafting subdivision (b), took as a premise that smoke that was as dark or darker than Ringelmann No. 2 obstructed the view to an identifiable degree that would serve as a standard for subsection (b). If the premise of the Legislature is a sound one, it is sufficiently definite to satisfy due process. On the other hand, if, as several expert witnesses testified, the opacity of the smoke of subdivision (a) may vary from 0 to 100, there is no sufficient standard by which to determine whether the contaminant does or does not offend.
 [11] We begin with the presumption that the Legislature acted advisedly. We repeat a quotation from an earlier case, found in Dribin v. Superior Court (1951), 37 Cal.2d 345, 352 [231 P.2d 809, 813, 24 A.L.R. 864]: "The existence of facts supporting the legislative judgment is to be presumed and the burden of overcoming the presumption of constitutionality is cast upon the assailant."
 A question should be noted, at this point, that may arise in future cases. We are not answering the question now because it has not been the subject of debate in any of the cases under review, and in none of the cases would an answer affect the outcome of the appeal. The question is this: May evidence be received for the purpose of showing that the presumption, that the Legislature had a basis for its action, is contrary to fact; that it had no basis? An affirmative answer is implicit in the quotation we made from Dribin v. Superior Court. We call attention, however, to the formidable line of cases, beginning with and citing Stevenson v. Colgan (1891), 91 Cal. 649, 652-653 [27 P. 1089, 1090, 25 Am.St. Rep. 230, 14 L.R.A. 459], which give comfort to those who would answer "No." On the other hand, such cases as Borden's Farm Products Co. v. Baldwin (1934), 293 U.S. 194 [55 S.Ct. 187, 79 L.Ed. 281]; Weaver v. Palmer Bros. Co. [137 Cal.App.2d Supp. 868] (1926), 270 U.S. 402 [46 S.Ct. 320, 70 L.Ed. 654], and United States v. Carolene Products Co. (1937), 304 U.S. 144 [58 S.Ct. 778, 82 L.Ed. 1234], may be used to support an affirmative answer to what may be a federal question. Note the annotation in 82 L.Ed. 1246 et seq.
 Certainly, the presumption is not one that can be said offhand to be without foundation. Support for the premise of subdivision (b) is found in the experiences related by the inspectors of the Los Angeles Air Pollution Control District. After many trials they learned to classify smoke according to the Ringelmann Chart. Then they were given experience in determining the opacity of various shades of smoke as determined by an electric eye. Thus, it could be concluded, they were acquainted with the opacity of Ringelmann No. 2 smoke and were trained to determine the opacity of other contaminants, and as a consequence could testify: "The white smoke I saw obscured the view fully as much as smoke of a shade equal to Ringelmann No. 2 would have done," or with equal assurance: "The opacity of smoke that matches Ringelmann No. 2 is 40%; that which was belching from the stack in question had a greater opacity." The circumstance that an inspector, with the usual training, demonstrates as a witness that he is confused and uncertain, does not justify the trial court in striking his testimony, although it would present a strong reason why the jurors, the judges of credibility and the weighers of evidence, should find it of little value.
 Further support for a conclusion in harmony with the presumption that the Legislature built on a sound premise is found in an argument made by some of the defendants. They insist that in subsection (a) one is called upon to look at the smoke, and it is only reflected light that is to be taken into consideration, while subsection (b) is only satisfied by ascertaining the comparative degree to which light is obstructed from coming through the smoke. This sounds reasonable and leads to this conclusion: If there is a substance in a column of smoke that reflects light so as to make the column as dark as Ringelmann No. 2, then there is a substance which is impervious to the passage of light, and renders the smoke partially opaque. We doubt that any smoke that is as dark as Ringelmann No. 2 would not interfere at all with the passage of light through it, as would be necessary in order to have an opacity of 0 per cent, stated by some defense witnesses to be the fact. On the other hand, the light reflected from [137 Cal.App.2d Supp. 869] the smoke could look white, while the substance that caused the reflection would be impervious to the passage of light.
 [12a] It is argued that as the question, Does smoke that matches Ringelmann No. 2 have an identifiable opacity?, is one of a scientific nature, we should take judicial knowledge of its answer. [13] It is true that in section 1875 of the Code of Civil Procedure it is provided that "Courts take judicial notice of the following facts: ... (8) The laws of nature ..." This code section, however, is to be applied in the light of the cases that deal with it. In Roy v. Smith (1933), 131 Cal.App. 148, 151 [21 P.2d 151, 158], we find: "It is true that courts may take judicial knowledge of scientific facts which are commonly recognized ... Upon the contrary, it is equally true that courts will not take judicial notice of facts which are not matters of common or general knowledge." Again we find the restrictive words in Cantrell v. Board of Supervisors (1948), 87 Cal.App.2d 471, 477 [197 P.2d 218, 222]: "Courts may take judicial knowledge of scientific facts which are commonly recognized." The principle is stated more generally in Communist Party v. Peek (1942), 20 Cal.2d 536, 546 [127 P.2d 889, 895]: "The doctrine of judicial notice was adopted as a judicial shortcut to avoid necessity for the formal introduction of evidence in certain cases where there is no real need for such evidence. Before a court will take judicial notice of any fact, however, that fact must be a matter of common and general knowledge, well established and authoritatively settled, not doubtful or uncertain. The test is whether sufficient notoriety attaches to the fact to make it proper to assume its existence without proof."
 [12b] There is no generally accepted answer to the question now under particular scrutiny. Among the 3,200 pages of transcript that we have read in these appeals, there has walked a procession of men, educated in some of the best colleges and universities of the country. They are agreed on but a few of the scientific problems presented by "smog." The question whether smoke as dark or darker than Ringelmann No. 2 has an opacity that may be used as a standard of comparison is not one of those on which there appears to be an agreement. We may not take judicial notice that the legislative premise is unsound.
 [14] Our conclusions up to this point, therefore, are that both subsections of section 24242 are, on their face, sufficiently definite to constitute criminal statutes; that to warrant [137 Cal.App.2d Supp. 870] a conviction under the section proof must be made: (1) that it was a contaminant that was discharged into the atmosphere, and (2) that the contaminant was either (a) of a shade as dark or darker than Ringelmann No. 2, or (b) that it obstructed the vision at least as much as would be smoke that was as dark as Ringelmann No. 2. With these conclusions in mind we turn to examine each case.
 People v. Plywood Manufacturers
 In three counts, in two complaints, charges were made that the defendant had, on three different days, discharged smoke that violated subsection (b). Convicted and sentenced on all three counts the defendant appealed, admitting the sufficiency of the evidence, but attacking the code sections and the complaints. We are affirming the judgments.
 By the complaint in each count the defendant corporation was charged with having discharged into the atmosphere "from a source of emission an air contaminant, to wit, smoke, for a period aggregating more than three (3) minutes in one hour, which said contaminant was then and there of such an opacity as to obscure the observer's view to a degree equal to and greater than that designated as Number 2 on the Ringelmann Chart ..." [15] We refrain from wondering why the word "single" which is employed in the statute was omitted from the complaint, for such speculation is vain. It suffices to say that while it would have been better had the language of the statute been followed, the use of the indefinite article "a" in effect limits the charge to one source of emission. Moreover, the evidence revealed only one possible source of emission, so that if it was error to overrule the demurrer directed to the omission of the "single" word, the error plainly did not prejudice the defendant.
 The defendant criticises the complaint because the hour is not specified during which, according to the charge, illegal smoke was emitted for more than three minutes. This was not a legal defect. Section 955, Penal Code, declares: "The precise time at which the offense was committed need not be stated except where the time is a material ingredient in the offense." A complaint that charges that the defendant violated an ordinance forbidding rubbish fires before 7 a. m., or after 11 a. m., in any calendar day would, of necessity, have to allege that the defendant had a fire either before 7 a. m. or after 11 a. m., for in such a case the time is an ingredient of the offense. Not so here, except, of course, that the illegal smoke must exist for three minutes in an hour. "What [137 Cal.App.2d Supp. 871] hour?" is quite immaterial; it need not be specified. Obviously, it would be fairer to the defendant to allege the specific date and hour that the People expect to prove, based upon the information at hand before the complaint was filed. [16] The law does not require, however, that the precise time be given. (See People v. Fremont (1941), 47 Cal.App.2d 341 [117 P.2d 891, 893]; People v. Sanchez (1939), 35 Cal.App.2d 231 [95 P.2d 169, 173]. [17] Moreover, if in charging a violation of section 24242 the time is such an ingredient of the offense that the precise hour should be alleged, failure to do so will not warrant a reversal where--as in this case--no prejudice to the defendant appears from the deficiency in the pleading. (People v. Mitchell (1940), 40 Cal.App.2d 204 [104 P.2d 545, 548]; People v. Gordon (1945), 71 Cal.App.2d 606 [163 P. 110, 116]; People v. Haley (1951), 102 Cal.App.2d 159 [227 P.2d 48, 51].)
 The judgments of conviction are affirmed. [18] Orders denying motions in arrest of judgment are not appealable. (Pen. Code, 1466; People v. Bechtel (1953), 41 Cal.2d 441, 446 [260 P.2d 31, 34].) The appeals from these orders are, therefore, dismissed.
 People v. Shell Oil Co.
 [19] Two charges were made against the Shell Oil Company and, following verdicts of guilty, two $125 fines were imposed. We have concluded that the judgments should be reversed because of a basic failure in the matter of instructions.
 There was much confusion and conflict in the testimony. The theory of the People's case, as to Count I, was that smoke was discharged into the air, of a shade at least as dark as Ringelmann No. 2. The defense produced evidence that that which was seen to emerge from the stack in question was not smoke but condensed steam, not shown to have any contaminating qualities. When we come to consider the evidence respecting Count II, which alleged a violation of subsection (b), we find not only this same conflict, but in addition much confusion as to the meaning of opacity and the "correlation" of opacity to the Ringelmann Chart. Indeed, the confusion began with the second count of the complaint which described the contaminant as being "of such an opacity as to obscure the observer's view to a degree equal to and greater than that designated as number 2 on the Ringelmann Chart." In the premises the defendant was entitled to specific instructions [137 Cal.App.2d Supp. 872] that the burden was on the People to prove beyond a reasonable doubt, (1) that that which was discharged from each stack was a contaminant; and (2) under Count II, that it had the opacity specified in subsection (b).
 The trial court gave the general instruction on the presumption of innocence and defining "reasonable doubt" that is contained in section 1096, Penal Code.
 The defendant requested the court to instruct the jury that in Count I it was accused of having discharged an air contaminant as dark in shade as that designated as Number 2 on the Ringelmann Chart, and that the prosecution must prove every element of said charge beyond a reasonable doubt. The instruction was given but not until a pen had stricken the words we have emphasized. An instruction was requested by the defendant ending with this sentence: "In other words, the prosecution must first establish beyond a reasonable doubt the power of No. 2 Ringelmann contaminant to obscure the view of the observer under the conditions prevailing and then establish that the contaminant, if any, emitted by defendant obscured the observer's view to the same extent." The instruction was given, but with the words we have emphasized omitted; a light pencil line was run through them. As to each count the defendant's request for an instruction that the prosecution must prove beyond a reasonable doubt that the material discharge was a contaminant, was refused. At no time was the jury advised that the burden was on the People to prove every essential fact of the charges beyond a reasonable doubt, or to so prove any one of them.
 The claim of error now being considered is not as easily disposed of as the People attempt by their statement that inasmuch as an instruction under section 1096 was given, "No further instruction on the subject of reasonable doubt was necessary," citing section 1096a, Penal Code. As pointed out in People v. Wilson (1929), 100 Cal.App. 428, 431-432 [280 P. 169, 170], that which section 1096a declares to be unnecessary, if 1096 is given, is any further instruction in which "reasonable doubt" is defined; it "has no application to an instruction covering a defense as shown by the evidence in the case from which reasonable doubt of the guilt of the defendant may be inferred." The reason for reversing the judgment given in People v. Eckert (1862), 19 Cal. 603, tells us enough about the case to show that it is pertinent (pp. 604-605): "One of the instructions which the defendant asked the Court to give the jury, but which the Court refused to [137 Cal.App.2d Supp. 873] give, was as follows: 'If they shall find that there is a reasonable doubt of Vance & Reed selling the cow to the Bakers, that defendant sold to Wooldridge, they will give defendant the benefit of the doubt, and find the defendant not guilty.' This instruction should have been given. The fact pointed out by this instruction it was material for The People to prove, in order to establish the defendant's guilt under the other circumstances of this case, and as the charge given by the Court as to reasonable doubt, though appropriate, was general in its terms, the defendant had a right to ask an instruction that if there was a reasonable doubt as to this essential fact, the defendant should have the benefit of it."
 Any question as to the authoritative value of so venerable a case as that just cited is set at rest by the fact that the last sentence that we have quoted from it was made use of in People v. Kane (1946), 27 Cal.2d 693, 698-702 [166 P.2d 285, 288- 290], in support of its conclusion that a general instruction re reasonable doubt does not suffice if the defendant requests that the doctrine be applied to a particular fact. We find the Kane case quite in point. There a real issue in the case centered around the question of the intention with which the defendant, accused of robbery, had taken a large sum of money from a Marie Nichols. The defendant's theory was that he and Marie had simulated a robbery; he had taken the money from her with her consent. "The trial court refused certain instructions, requested by defendant, as to the specific application of the doctrine of reasonable doubt to the facts as testified to by defendant ..." This was one of the instructions requested: "Before you can convict the defendant in this case, you must be convinced beyond a reasonable doubt that the property taken was against the will and without the consent of Marie ..." Two more, to like effect, were requested. All were refused. The judgment was reversed because of the error committed in refusing these instructions. We quote one further passage from the opinion (27 Cal.2d 699-700 [166 P.2d 290]): "The People further urge that, since the statutory definition of robbery (Pen. Code, 211) and the statutory instruction concerning reasonable doubt (Pen. Code, 1096) were read to the jury, they were fully informed as to the law relating to defendant's theory and the refusal of the more specific instructions requested was not erroneous, or, if it was erroneous, could not have prejudiced defendant."
 "As to the general statutory definitions of robbery and [137 Cal.App.2d Supp. 874] reasonable doubt, which were given as instructions, a statement from People v. Cook (1905), 148 Cal. 334, 347 [83 P. 43], is apt: 'It is true that the instruction given stated the law correctly; but it was brief, general, and colorless in comparison with the instruction asked, and had the effect of minimizing the importance of a consideration which could not have been stated with too much emphasis.'"
 "The situation is similar to that presented in People v. Visconti (1916), 31 Cal.App. 169, 170 [160 P. 410, 411], where the court said, 'In view of the testimony offered for the purpose of establishing an abili, the defendant asked the court to give an instruction by which the jury was to be informed that in making the proof of an alibi the defendant was not obliged to establish that defense by a preponderance of evidence or beyond a reasonable doubt, but that it was sufficient to entitle him to a verdict of not guilty if the proof raised in the minds of the jury a reasonable doubt as to the presence of the defendant at the place where the crime was alleged to have been committed and at the time referred to in the information. The court refused to give this instruction, or any instruction upon the matter of the defense of an alibi. It seems to be conceded, as it must, that the instruction as proposed was pertinent and proper; but the contention is made that inasmuch as the trial judge did instruct the jury that they must believe beyond a reasonable doubt that defendant committed the crime, no prejudice would arise by reason of the failure to instruct directly upon the matter of the alibi proof. The instruction of the court which was given was general, and stated in substance that before conviction could be had it was incumbent upon the prosecution to prove beyond a reasonable doubt all of the matters alleged in the information. We think that defendant was entitled to have some particular and specific instruction given touching the matter of his defense of an alibi.' "
 The case of People v. Reed (1952), 38 Cal.2d 423, 430 [240 P.2d 590, 594], does not cause us to question the value as an authority of People v. Kane, from which we have been quoting. In the first place, no instruction requested by the defendant was refused, and, as the court pointed out, a defendant who does not ask that a matter correctly, but generally, covered be more specifically treated, cannot complain. Moreover, the jury was instructed that "This plea [of not guilty] ... places the burden upon and makes it the duty of the prosecution, before a conviction can be had, to establish [137 Cal.App.2d Supp. 875] to the exclusion of all reasonable doubt, each and every fact essential to a conviction of the crime charged." It was also advised: "each fact which is essential to complete a chain of circumstances that will establish the defendant's guilt must be proved beyond a reasonable doubt." The case was not faced with the problem considered in People v. Kane and which faces us.
 The error in failing to advise the jury that each essential fact had to be proven by the People beyond a reasonable doubt cannot be said to be without prejudice in this case. We find no support in the record for the statement made by counsel that the instructions were placed in the hands of the jurors, but they may have been. (Pen. Code, 1093.) If they were, the crossed-out words may well have led the jury to believe that they did not apply. In any event, in view of the conflict, and confusion, in the evidence, the defendant was entitled to this basic instruction on reasonable doubt as it applied to the particular facts.
 The judgment on each count, and the order denying the defendant a new trial, are reversed.
 People v. Union Oil Co.
 The four complaints filed against the Union Oil Company contained, altogether, eight counts, charging violations of section 24242 on seven different days, the charge as to one of the days identifying two different sources of emission. Each count alleged a violation of both subdivisions (a) and (b), but at the outset of the trial the attorney for the People announced that while no charge was to be withdrawn, the evidence to be introduced would be in support of the opacity violations only. Fines ranging from $25 on four of the counts to $500 on one were assessed following defendant's conviction on all eight counts, and from these judgments (and an order denying it a new trial) the defendant has appealed. We find none of the contentions made by the appellant to be sufficiently sound to warrant a reversal.
 The defendant presents four points in its briefs, beginning with the contention that section 24242 violates the due process provisions of our Constitution. We have already expressed our views on this point. [20] Defendant's second contention centers around the premise that the People's witnesses were not qualified to testify as to the comparative opaqueness of the plumes streaming from defendant's stacks and smoke that was a dark as Ringelmann No. 2. It is our view of the evidence [137 Cal.App.2d Supp. 876] that the trial court correctly refused to advise the jurors not to consider the testimony of the inspectors that were called as witnesses by the People. Whether they should be credited, or such witnesses as Dr. Jeffreys, called by the defendant, should be followed, was a question properly left to the jury.
 With the basic principle of defendant's third point we are in accord. It is, that it was incumbent on the People to prove beyond a reasonable doubt, as to each count, that that which had the opacity specified in section 24242, and came from defendant's stacks, was a contaminant. We see no reason, in this opinion, to weigh the evidence in view of the admission in defendant's reply brief that "There is no doubt that the evidence is sufficient to support the verdicts if it was admissible." [21] The argument that it was inadmissible proceeds as follows: The statute requires opacity to be determined by reference to the Ringelmann Chart; no inspector was trained to determine opacity "by physical use of the Ringelmann Chart"; therefore, no inspector was qualified to testify, and the evidence that he gave was inadmissible. We have already paid our respects to this line of reasoning. Opacity is not to be determined by a comparison with the chart but by a comparison with the opacity of smoke that matches Ringelmann's No. 2; the evidence furnishes a basis for the conclusion that the inspectors' training qualified them to testify; if any one of them appeared poorly qualified, or confused, the weight of his testimony became a problem for the jury; it was not "inadmissible."
 [22] The defendant requested an instruction beginning with the words: "Unless you are convinced beyond a reasonable doubt that the defendant" and ending with the words: "your must find the defendant 'not guilty' as to such charge or charges." In between the words quoted was a statement that corresponded to the contents of section 24242, using the alternative (b). The trial court should have given the instruction, but because it was as general as the statute, and that was read to the jury, along with section 1096, Penal Code, we do not deem the error one warranting a reversal. It is often a very close question whether an error is or is not of such a nature that we can say that, in our judgment, the defendant would doubtless have been convicted had the error not been made. Obviously, the identical error may cause a reversal in one case and not in another. (Cal. Const., art. VI, 4 1/2.) [137 Cal.App.2d Supp. 877]
 [23] It was not error to refuse an instruction, the effect of which was to advise the jury that the guilt of the defendant could not be established by evidence of the opacity of the substances emitted from its stacks as observed at some distance from them. The evil that the Legislature was striving to correct was not the condition of the atmosphere just at the mouth of defendant's stacks. [24] A contaminant that for some reason has no opacity as it emerges may prove to be as fully within the condemnation of section 24242 as does that immediately identifiable.
 We see no reason to discuss other features of these cases. The judgments and the orders denying a new trial are affirmed.
 People v. Southern California Edison Co.
 The Southern California Edison Company was originally charged with having violated both subsections (a) and (b) on four different days, but before the trial was over it was agreed by the prosecuting attorney that only subsection (b) was involved. The defendant was found guilty and sentenced to pay a fine of two hundred dollars on each count. In appealing, it presents but three points: (1) that section 24242 is unconstitutionally uncertain; (2) that the evidence was insufficient to establish that it was a contaminant that the defendant had discharged into the air; and (3) that the jury should have been instructed that the effect of rule 53 of the Air Pollution Control District was to declare sulphur dioxide not a contaminant if it did not exceed in concentration 0.2 per cent by volume.
 [25] We do not find the evidence to be insufficient. The jury was warranted in concluding, from it, that the People's witnesses had been trained to tell whether black smoke was as dark or darker than Ringelmann No. 2; to determine the opacity of either black or other smoke; and that they were familiar with the opacity of smoke as dark as Ringelmann No. 2, and that it was 40 per cent, while smoke identified as Ringelmann No. 3 was 60 per cent opaque. On four different different occasions a plume was seen to emanate from one of appellant's smoke stacks, dirty tan in color or a brownish gray, and with an opacity, on one day, of 80 per cent; on another day of 70 per cent; on a third of 65-75 per cent; and, lastly, with an opacity of 70 per cent. On no occasion was that which came forth from the smoke stacks and lingered so long, condensed water vapor. As "regular commercial [137 Cal.App.2d Supp. 878] grade fuel oil" was being burned on the four days when the plumes were noticed, the jury had reason for its evident conclusion that the combustion was incomplete and that smoke resulted. [26] Smoke, we note again, is a contaminant whether or not it is "noxious."
 This appellant is one of those who argue that section 24242 is too uncertain to be valid because smoke as dark as Ringelmann No. 2 has no predeterminable opacity. Having already expressed our views on this subject we shall not repeat them. [27] We mention the point only because this appellant suggests--a stronger word in hardly proper--that if the argument is not good, then this requested instruction should have been given the jury: "That statute under which this prosecution is brought presupposes that smoke of the shade designated as No. 2 on the Ringelmann Chart under all conditions will appear to an observer to have the same opacity, and that the same is true with respect to smoke of a darker shade. If from all the evidence in this case there is a reasonable doubt in your minds that this is true, then in so far as it deals with opacity the statute fails to lay down any certain standard of guilt, and you may not return a verdict of 'guilty' against either defendant on the sole ground that such defendant has discharged into the atmosphere an air contaminant of a forbidden opacity."
 Whatever may prove to be the answer to the question, May evidence be received to overcome the presumption that the legislature acted advisedly?, this instruction was erroneous and was properly refused. That which would be under investigation, under the instruction, would not be the defendant's guilt, but the validity of legislative action. [28] That action is not to be held to be invalid in the event the jury has a doubt whether a foundation exists, but, at best, only in the event that it appears without a reasonable doubt that no basis for it did exist. (See Jersey Maid Milk Products Co. v. Brock (1939), 13 Cal.2d 620, 636 [91 P.2d 577, 586]; Ferrante v. Fish & Game Com. (1946), 29 Cal.2d 365, 371-372 [175 P.2d 222, 226]; and Borden's Farm Products Co. v. Baldwin (1934), 293 U.S. 194, 209 [55 S.Ct. 187, 79 L.Ed. 281, 288]; Borden's Farm Products Co. v. Ten Eyck (1935), 297 U.S. 250, 263 [66 S.Ct. 453, 80 L.Ed. 669, 674].)
 The consideration of appellant's remaining point turns our attention to section 24260 of the Health and Safety Code, which authorizes the air pollution control board of any air [137 Cal.App.2d Supp. 879] pollution control district to "make and enforce all needful orders, rules, and regulations necessary or proper to accomplish the purposes of this chapter for the administration of such district." This portion of rule 53, adopted by the Los Angeles Air Pollution Control Board, was relied upon by the defendant as an official determination that sulphur dioxide of less than 0.2 per cent by volume is not a contaminant: "A person shall not discharge into the atmosphere from any single source of emission whatsoever any one or more of the following contaminants, in any state or combination thereof, exceeding in concentration at the point of discharge: a. Sulphur Compounds calculated as sulphur dioxides (SO2): 0.2 per cent, by volume." [29] We are of the opinion that an air pollution board may not, and by its adoption of rule 53 the Los Angeles board did not attempt to, exempt sulphur dioxide less concentrated than that described in the rule, from the condemnation of section 24242, if, in fact, it falls within that condemnation. Without laboring the point further, we are convinced that the appellant has no cause to feel aggrieved because its instructions respecting rule 53 were not given.
 We are not persuaded that any ground exists to reverse the judgments in this case. They, and the order denying the defendant a new trial, are affirmed.
 SWAIN, J.
 I concur in all cases but People v. Shell Oil Co. In the latter case I dissent. The majority opinion relies on People v. Kane (1946), 27 Cal.2d 693 [166 P.2d 285]. This case (a four to three decision) is not presently the law for the following reasons:
 1. It is contrary to the later case of People v. Reed (1952), 38 Cal.2d 423, 430 [240 P.2d 590]: "The court's instruction on the presumption of innocence and defining reasonable doubt followed the language of section 1096 of the Penal Code. By additional instructions, the court explained the effect of the presumption and stated the doctrine of reasonable doubt."
 "These instructions, Reed complains, are only general. No instruction was given to the effect that each element of the crime must be proved beyond a reasonable doubt. But the law expressly specifies that the court may read section 1096 of the Penal Code and need not give any other instruction on the presumption of innocence or reasonable doubt. (Pen. [137 Cal.App.2d Supp. 880] Code, 1096a.) Considering all of the instructions, it appears that the jury was fully and fairly instructed as to all of the rules of law applicable to the evidence."
 2. It is in direct conflict with Penal Code 1096a.
 3. It relies strongly on People v. Cook (1905), 148 Cal. 334 [83 P. 43], which was decided before 1927, the year in which Penal Code 1096a was enacted.
 4. It relies on People v. Visconti (1916), 31 Cal.App. 169 [160 P. 410, 411], and People v. Wilson (1929), 100 Cal.App. 428 [280 P. 169], one decided before and one after Penal Code 1096a was enacted. Neither of those cases supports the principle on which People v. Kane was decided. They deal with the burden of proof which rests on a defendant to prove the defense of alibi. The distinction between the burden of proof which rests on the prosecution and that which rests on a defendant to prove such defense is pointed out in the dissenting opinion, at page 704, of the Kane case.
 I concur in affirming all cases except People v. Shell Oil Co. (CR A 3286). I would affirm the judgment and the order in that case.
 PATROSSO, J.
 I concur in the result announced and all that is said in the opinion of the Acting Presiding Judge. In order to avoid any misunderstanding, however, I desire to emphasize that in order to establish a violation of section 24242(b), the People must establish beyond a reasonable doubt that the defendant discharged into the atmosphere from a single source of emission an air contaminant for a period or periods aggregating more than three minutes in any one hour, which contaminant was of such opacity as to obscure an observer's view to a degree equal to or greater than does smoke as dark or darker in shade as that designated as No. 2 on the Ringelmann Chart. Implicit in this is the requirement that the People establish beyond a reasonable doubt the degree to which No. 2 Ringelmann smoke obscures the view of an observer, and a defendant charged with a violation of subdivision (b) is entitled, upon timely request, to an instruction to this effect.
 While I cannot escape the feeling that some of the inspectors of the Air Pollution Control District who testified upon behalf of the People were laboring under the erroneous belief that the percentage figures on the Ringelmann Chart expressed degrees of opacity in the sense that smoke of the particular shade obscured the vision of the observer to the [137 Cal.App.2d Supp. 881] same degree, expressed in terms of percentage, as the blackness of smoke of the various shades designated thereon, I am in agreement with the conclusion of Judge Bishop that there was competent evidence, if believed by the jury, as it seemingly was, to support their implied finding that the contaminant emitted by the defendant in each case was such as to obscure an observer's view to a degree equal to or greater than does smoke of a shade as dark or darker than that designated as No. 2 on the Chart.